UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

_____

|                                              |   |                 |
|----------------------------------------------|---|-----------------|
| PLEXUS CORP.,                                | ) |                 |
|                                              | ) |                 |
| Plaintiff,                                   | ) |                 |
|                                              | ) |                 |
| vs.                                          | ) | Case No.        |
|                                              | ) |                 |
| STREAMEX CORP., formerly known as            | ) |                 |
| BIOSIG TECHNOLOGIES, INC.,                   | ) |                 |
|                                              | ) |                 |
| Defendant.                                   | ) |                 |
|                                              | ) |                 |
|                                              | ) |                 |

_____

## COMPLAINT

_____

Plaintiff Plexus Corp. ("Plexus"), for its Complaint against Defendant Streamex Corp., formerly known as BioSig Technologies, Inc. ("BioSig"), alleges as follows:

### Parties, Jurisdiction, and Venue

1.　　　Plexus is a Wisconsin corporation maintaining its principal place of business at One Plexus Way, Neenah, Wisconsin 54956.

2.　　　Prior to its merger with Streamex Exchange Corporation in 2025, BioSig Technologies, Inc. was a Delaware corporation maintaining its principal place of business at 54 Wilton Road, 2nd Floor, Westport, Connecticut 06880.

3.　　　On September 12, 2025, following BioSig Technologies, Inc.'s merger with Streamex Exchange Corporation, BioSig Technologies, Inc. changed its name to Streamex Corp.

4.　　　Streamex Corp. is a publicly traded corporation organized under the laws of

the state of Delaware, with its principal place of business at 2431 Aloma Avenue, Suite 243, Winter Park, Florida 32792.

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between BioSig and Plexus, and because the amount in controversy exceeds $75,000, exclusive of costs, interest, and attorneys' fees.

6.    The Court has personal jurisdiction over BioSig because this action arises out of contractual promises and performance in Wisconsin. *See* Wis. Stat. §§ 801.05(5).

7.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plexus's claims occurred in this district.

## The Parties' Contract

8.    BioSig, as buyer, and Plexus, as seller, are parties to a Manufacturing Professional Service Agreement (the "Contract") under which Plexus manufactured and supplied certain circuit board assemblies (the "Products") to BioSig. The parties' Contract is attached hereto at **Ex. 1**.

9.    The Products are manufactured according to BioSig's unique design and specifications, and are not readily salable to anyone other than BioSig.

10.    Pursuant to the procurement and delivery framework set forth in the Contract, BioSig agreed to provide regular forecasts to Plexus identifying its anticipated demand for the Products (the "Forecasts"). BioSig agreed to provide a twelve-month Forecast, updated monthly on a rolling basis, for Plexus to order the components necessary to manufacture the Products. (**Ex. 1**, ¶ 6.A.) Although the forecasts did not obligate BioSig to ultimately provide firm orders for the number of products forecasted, the forecasts were required so that Plexus

could plan its capacity and procure the components at their individual lead times.

11. BioSig expressly agreed to assume liability for component inventory procured by Plexus (the "Components") to support BioSig's Forecasts.

12. Specifically, the Contract provides, in relevant part, that "[BioSig] **shall be liable** for all Components, at the Component Values, procured to support the Forecast and as otherwise provided in this Agreement." **Ex. 1**, Section 6(A) (emphasis added).

13. As Plexus conveyed to BioSig and BioSig understood, providing accurate Forecasts was critical to ensuring Plexus had sufficient lead time to procure each of the necessary Components.

14. The terms "Components", "Component Values" and "Forecast" memorialized in Section 6(A) are expressly defined terms under the Contract:

A. The term "Component" is defined as "any and all materials (including software) that are used in the manufacture of Customer's Products." *Id.* at Section 1(D).

B. The term "Component Value" is defined as, in relevant part, "the quoted cost for a given Component plus material overhead[.]" *Id.* at Section 1(C).

C. The term "Forecast" is defined as "[the] twelve (12) month rolling estimate of Demand for each Product, including the quantities to be manufactured and the requested Product delivery date, as agreed upon by the parties." *Id.* at Section 1(K). In turn, "Demand" is expressly defined as "[BioSig's] stated demand for Product as set forth in Forecast [sic] and Purchase Orders." *Id.* at Section 1(H).

15. Similarly, Section 11(B)(1) of the Contract imposes obligations upon BioSig with respect to Components procured by Plexus that remained in Plexus's inventory for more than sixty days (the "Aged Inventory"):

1) <u>Aged Inventory</u> – In the event any Components procured by Plexus remain in Plexus' inventory for more than sixty (60) days ("Aged Inventory"), Customer shall: (a) immediately provide Plexus with a Purchase Order to consume such Aged Inventory within the subsequent thirty (30) days, (b) within ten (10) days pay Plexus a deposit in the amount of the Component Value of the Aged Inventory, which will be reconciled in accordance with the terms of this Agreement, or (c) immediately begin paying to Plexus a monthly inventory management fee equal to the Carrying Cost multiplied by the Component Value of the Aged Inventory. In the event any Components procured by Plexus remain in Plexus' inventory for more than six (6) months, option (c) above shall expire and, in the event that Customer elects option (b) above, Customer shall, in addition, immediately begin paying to Plexus a monthly inventory management fee of one half percent (0.5%) of the Component Value of the Aged Inventory. In the event any Components procured by Plexus remain in Plexus' inventory for more than one (1) year, Customer shall exercise option (a) above or provide instructions to Plexus to either ship or scrap the Components, upon which Plexus shall invoice Customer for the Component Value, plus profit, of such Components.

16.     Consistent with the foregoing, if Aged Inventory remained within Plexus's possession for more than one year, the Contract expressly required BioSig to either (1) issue a Purchase Order to consume said Aged Inventory; or (2) specifically instruct Plexus to either ship or scrap the Aged Inventory and compensate Plexus for the Component Value, plus profit, of said inventory. *Id.*

17.     The Contract expressly required BioSig to remit all payments owed to Plexus under the Contract within the 15 calendar days following the date of Plexus's invoices issued to BioSig. *Id.* at § 5(C).

18.     The Contract expressly permits Plexus to terminate the parties' Contract if BioSig materially breaches the Contract by failing to timely pay Plexus, and BioSig's breach of its payment obligations remains uncured following five days' written notice to BioSig. *Id.* at Section 16(A).

19.     The Contract provides at Section 16(B) that following termination of the Contract pursuant to Section 16(A), BioSig agrees to compensate Plexus for certain costs including but not limited to finished Product costs, Component costs, and other reasonable expenses Plexus incurred as a result of termination:

B. **Effects of Termination** – Upon receipt of notice of termination of this Agreement the parties will meet to establish a transition plan including, but not limited to, Product build schedules, return of Customer Owned Property and resolution of Component inventory liability. For any outstanding accepted Purchase Orders as of the termination effective date, Plexus will complete all outstanding Purchase Orders and the provisions of this Agreement will survive termination and apply to such performance. Customer agrees to pay Plexus for (1) any finished goods Products; (2) any work-in-progress Products at the finished goods Product price; and (3) any Components, at the Component Value plus profit, on hand, on order or that Plexus is obligated to purchase as of the date of termination. In addition, Customer and Plexus shall negotiate in good faith a settlement of charges to be paid by Customer for reasonable expenses incurred by Plexus as a result of the termination of this Agreement, including, but not limited to, manufacturing process ramp down costs and packaging and transportation costs and expenses, and the return to Customer of any Customer-Owned Property, Tooling or any other items.

20.     The Contract further provides, in relevant part, that Section 16 addressing the effects of termination, including but not limited to BioSig's obligation to compensate Plexus for any remaining Products and Components, survives notwithstanding any party's termination of the Contract. *Id.* at Section 20(H).

21.     The Contract is governed by the laws of the State of New York, irrespective of any conflicts of law provisions. *Id.* at Section 20(D).

### BioSig Breaches the Parties' Contract

22.     Following the execution of the Contract, BioSig began supplying Plexus with a twelve-month Forecast, updated on a monthly rolling basis, setting forth estimates of BioSig's Demand for each Product, including the quantities of Products to be manufactured and the requested Product delivery dates.

23.     Plexus began procuring Components pursuant to BioSig's Forecasts and supplying Products to BioSig consistent with the issued Purchase Orders.

24.     Soon after Plexus started delivering Products to BioSig, BioSig's demand for the Products decreased and was less than the quantity of Products contemplated in BioSig's Forecasts upon which Plexus relied to procure Components, including because BioSig experienced difficulties conforming the Products to the devices it manufactured.

25.     From October 2021 through August 2023, Plexus continued to purchase

Components in direct reliance on BioSig's Forecasts resulting in Plexus amassing a large quantity of Components which remained in Plexus's inventory for at least sixty days (and, ultimately, for over a year), thereby constituting "Aged Inventory" under the Contract. *See* **Ex. 1**, Section 11(B)(1).

26.     During this time, Plexus provided quarterly inventory reports to BioSig memorializing the Components that Plexus retained on hand as a direct consequence of BioSig's Forecasts. The quarterly reports list, among other things, what components were in Plexus's possession, which have been ordered, which were non-cancellable/non-returnable to the supplier, which were BioSig-owned versus procured by Plexus, and what the values were in various aging buckets. In addition, Plexus held periodic meetings with BioSig where said Component inventory was discussed.

27.     Plexus acquired and maintained the Aged Inventory at significant cost to Plexus, including costs to acquire the underlying Components as well as carrying costs incurred to store and maintain the Aged Inventory.

28.     From January through March 2024 the parties' executive teams met and exchanged communications regarding Plexus's growing position in the Aged Inventory and the outstanding balance BioSig owed to Plexus for said inventory.

29.     On February 8, 2024, Plexus elected to cease procuring Components for the Products given its reasonable concerns regarding BioSig's operational and financial stability.

30.     In March 2024, BioSig informed Plexus that it was ceasing operations and the majority of BioSig's leadership team was terminated. By February 2024, BioSig ceased ordering Products from Plexus entirely.

31.     Despite Plexus's demands, BioSig failed to compensate Plexus for delivered

Products as well as Components and Aged Inventory, contravening its contractual obligation to timely pay Plexus when the balance on Plexus's issued invoices became due.

32.     By August 2024, BioSig had ceased responding to Plexus entirely, including to Plexus's numerous requests to BioSig throughout the preceding months requesting that BioSig instruct Plexus regarding the disposition of the Aged Inventory.

## Plexus Terminates the Parties' Contract

33.     On September 11, 2024, Plexus sent BioSig a letter expressly notifying BioSig of its material default under the Contract arising from BioSig's failure to compensate Plexus for the carrying costs and value of the Aged Inventory (the "Notice of Default").

34.     BioSig did not respond to the Notice of Default, nor did it compensate Plexus for the Aged Inventory or the Outstanding Balance at any point thereafter.

35.     On January 10, 2025, Plexus sent BioSig a letter advising that Plexus was electing to terminate the Contract effective immediately pursuant to Section 16(A) of the Contract as a result of BioSig's failure to cure its default, as originally set forth in the Notice of Default (the "Notice of Termination").

36.     As of Notice of Termination, the aggregate total of the Outstanding Balance that remained due and owing to Plexus for the Aged Components was at least $1,246,189.03.

37.     BioSig did not respond to the Notice of Termination, nor did it seek to address the Aged Inventory or the Outstanding Balance at this time.

38.     Plexus exercised reasonable efforts to dispose of the Aged Inventory, including attempting to sell the Aged Inventory to other parties. Despite its best efforts, the majority of the Aged Inventory was unable to be sold and Plexus was thereby compelled to scrap and dispose of the Aged Inventory.

39.     As of the present date, the amount BioSig is obligated to pay Plexus for the Aged Inventory pursuant to the Contract totals at least $1,246,987.03.

## COUNT I – BREACH OF CONTRACT

40.     Plexus and BioSig had a valid and mutually binding Contract that required BioSig to timely pay Plexus for delivered Products and the value of Components, including but not limited to the Aged Inventory.

41.     BioSig is bound by the obligations set forth in the Contract.

42.     Plexus fulfilled all of its contractual obligations under the Contract in all material respects.

43.     BioSig's failure to instruct Plexus with respect to the disposition of the Aged Inventory or to compensate Plexus for the value of the Aged Inventory in accordance with Contract constitute material breaches of BioSig's contractual obligations.

44.     As a direct and proximate result of BioSig's breach of the Contract, Plexus has been damaged in the amount to be proven at trial but exceeding $1 million, exclusive of expenses, costs, and reasonable attorneys' fees.

## COUNT II – UNJUST ENRICHMENT

45.     Plexus incorporates by reference in this Count II all preceding allegations in this Complaint.

46.     Plexus pleads this unjust enrichment claim in the alternative to its breach of contract claim.

47.     Plexus conferred direct benefits upon BioSig, including by purchasing Components for the Products and supplying Products to BioSig.

48.     Plexus was directly and proximately harmed by its retention of the

Components, including the Aged Inventory, pursuant to BioSig's representations as communicated to Plexus through the Forecasts.

49.     Plexus was directly and proximately harmed by BioSig's refusal to pay for the Components, including the Aged Inventory.

50.     Plexus's purchase of the Components conferred a direct benefit upon BioSig and Plexus has not been compensated for that benefit, such that BioSig has been unjustly enriched.

**RELIEF REQUESTED**

**WHEREFORE**, Plexus prays that the Court:

1.     Enter a money judgment against BioSig for the amount adjudged to be due and owing Plexus from BioSig under the Contract;

2.     Award Plexus pre- and post-judgment interest to the extent allowable by law;

3.     Award Plexus its reasonable attorney's fees incurred in this action;

4.     Award Plexus its costs of suit and expenses; and

5.     Order such other and further relief as the Court deems just and proper.


Dated: December 10, 2025                    Respectfully submitted,

                                            FOLEY & LARDNER LLP


                                            */s/ Charles W. Niemann*
                                            Charles W. Niemann, Esq.
                                            777 E. Wisconsin Avenue
                                            Milwaukee, WI  53202
                                            (414) 297-5149 (telephone)
                                            (414) 297-4900 (facsimile)
                                            cniemann@foley.com

                                            Irina N. Kashcheyeva (*application for*

9

*admission forthcoming*)
Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
(313) 237-7100 (telephone)
ikashcheyeva@foley.com